DISTRICT COURT SUMMARY JUDGEMENT ORDER OF NON-INFRINGEMENT SHOULD BE REVERSED BASED UPON A DENOVO REVIEW. CLAIM CONSTRUCTION. CLAIM ONE OF BOTH PATENTS ARE SYSTEM CLAIMS. DISTRICT COURT CONSTRUED THE CONTOUR GENERATOR AS SOFTWARE AND CONFIGURED TO SIMPLY MEANS PROGRAMMED TO PERFORM THE FUNCTIONS OF THE CLAIM. THAT IS VERY CLEAR UNDER THIS COURT'S BRUSADA, TYPHOON TECHNOLOGIES, AND FINCHEN CASES. DISTRICT COURT THEN IMMEDIATELY WENT ON IN FINDING NO TRIBAL ISSUE OF INFRINGEMENT. IN FACT, NOT TO APPLY THAT, THE BROADER VIEW, BUT TO SAY, OR RATHER, I GUESS, TO APPLY THAT VIEW AND NOT TO APPLY THE NARROWER VIEW THAT YOU CONFER. SO WE WOULDN'T, IN FACT, HAVE TO GET TO THE CLAIM CONSTRUCTION QUESTION IF WE THOUGHT THE DISTRICT COURT WAS RIGHT ABOUT THE NON-INFRINGEMENT FINDING ON EVEN YOUR CONSTRUCTION. WELL, I THINK THAT THE FIRST ORDER OF BUSINESS IN... WELL, NO, NOT NECESSARILY. ASSUME THAT WE DON'T HAVE A STRICT SEQUENCING RULE. FAIR ENOUGH. WELL, I THINK THAT WHAT THE DISTRICT COURT DID WAS, AS THE COURT HAS POINTED OUT, IS THEY SAID EVEN IF THIS IS A CAPABILITY CLAIM, WE STILL BELIEVE THAT THERE'S NO INFRINGEMENT. THAT'S CORRECT. THAT'S WHAT THE DISTRICT COURT DID. SO WHY IS THAT WRONG? WELL, IT'S WRONG. IT'S WRONG FOR A NUMBER OF REASONS. THE FIRST IS THAT, AS MR. BEHR, THE EXPERT FOR THE DEFENDANT, STATED, WHEN THIS SECOND PASS IS PERFORMED, IT'S AN ANOMALY, OR IT ONLY HAPPENS IN SOME CASES TO USE BOTH LANGUAGE, IN WHICH AN INVERTED CONE WOULD BE CREATED. SO I HAD TWO PROBLEMS WITH THAT, AND TELL ME WHY THEY'RE NOT, IN FACT, RIGHT. THE FIRST IS, I DIDN'T ACTUALLY SEE IN YOUR ARGUMENT OPPOSING SUMMARY JUDGMENT THAT YOU RELIED ON THAT. I KNOW THAT YOU CITED CERTAIN PASSAGES OF THEIR BRIEF, WHICH CITED CERTAIN PASSAGES OF THE RECORD THAT INCLUDED THAT, BUT I DIDN'T SEE YOUR MAKING THE ARGUMENT THAT THAT TESTIMONY ACTUALLY ESTABLISHED THAT THEIR SOFTWARE DOES THIS AT LEAST SOME OF THE TIME, NAMELY ONLY POINT-UP CONES SOME OF THE TIME. THE SECOND IS, I DIDN'T READ HIS TESTIMONY TO SAY THAT IT WAS ANOMALOUS THAT YOU WOULD HAVE DISPLAYS CONTAINING POINT-DOWN CONES, BUT RATHER THAT IN ANY GIVEN DISPLAY, THE POINT-DOWN CONES ARE GOING TO BE ANOMALOUS BECAUSE MOST OF THE CONES ARE GOING TO BE POINT-UP. Let me answer that directly in two ways. With respect to the first issue, it's absolutely in the brief. All the issues that we are raising on appeal were in the opposition to summary judgment. It's in there, and I can walk the court through that if the court would like to see that. I would like to see that. Sure. Because what I saw was two theories. The sub-images theory, and then the interpretation of the claim that actual values, that you compare the graphical representation of the contour lines to the actual data value of the data point. Okay. So, Your Honor. And I didn't see this third one, which is what we're apparently talking about right now. So, on JA 8574, lines 7 to 18, that contains the argument that we're making that inverted cones still infringe the claims. If you go down to... That's a different argument. That's one of the arguments that Judge Schenck just referred to. The point that I think we were specifically talking about is where you said that there is evidence that displays will occur that contain no inverted cones. Well, we say that that's the argument with respect to the sub-images on lines 20 to 24. And then on base number, or excuse me, JA 8575 is this argument that their expert testified that infringement occurs some of the time. So, it's all in there, Your Honor. Did you introduce any evidence of any images, for example, where there are no inverted cones? Your Honor, no, if you're looking at it from the vantage point of the whole display. But our point is that the software can generate smaller displays. So, for example, if there's one exhibit in evidence... You had Viz2's software, right? That's correct. How come you didn't run an image like that? At the time, Your Honor, the issue that was being raised with respect to the issue we're talking about, these inverted cones, was not in the case. It's not something that we were really looking for. And we knew that it was the functionality of the software that you could already create limited displays. So, we just focused on generating larger displays, and that's what we did. In fact, I think what happened is, when we did the demonstration and we looked at the software, that we just ran it as the whole casino. We didn't run it as to individual displays. But we knew that functionality was there. What would have happened had you run it to the individual displays? So, on JA6153, I think the court has seen this. Yes. What do we have? Just a word of caution. We're looking at a confidential appendix, and some of the briefing was labeled confidential. So, I caution counsel in intruding into areas of each other's confidential data without bringing it to our attention. And don't lead us there either.  The right-hand side contains a bank of slot machines, 12 of them in all. And you can see them numbered. Not one of those cones is an inverted cone. So, all that needs to be done in this software is you make a call for this bank of slot machines, and then you have no inverted cones. And you can even go more microscopic than that. You mean the entire second column with both sides of the table and not just those? Slot machines 1 through 12 is what I'm referring to. And you're saying that there's no inverted cone in that? On the right-hand side where it says 11-022. What about on the left-hand side? There is an inverted cone there in 03. Right. So, you'd have to crop this image to get what you wanted? Not necessarily. What I'm explaining to the court is you can run a query that will call just for that bank of slot machines. You don't have to get a display of the whole casino floor and then crop an image or zoom to an image. You can actually make a request. We only want to see one slot machine. We want to see slot machines of certain denomination. We want to see certain manufacturer slot machine. All of that capability is there. That's the point. We just don't have any evidence in the record that that's ever happened. And my question to you was whether you had submitted any images that did not show an inverted cone. Well, the ones I just showed the court, but of course those are of a whole casino floor in fairness. We did not do a request or a routine that called for a specific bank of slot machines or specific slot machine images. But what we have in the record... is JA 514, 520. And the court can see the quote on this page that says, with the in-spatial supergraphic heat maps, see and analyze the performance of the whole floor, areas of the floor, banks of machines, and even groups of machines or individual machines. And it is correct that this entire exhibit was not attached to the summary judgment motion. It was referred to in the claim charts of our expert, which was attached to summary judgment. And if the court looks at the picture, it's on JA 514. It's on that. That was in our brief, our opposition to the summary judgment motion. So what does this picture show? Well, it has a quote, Your Honor. And then the picture is just a picture of a real-time display of the slot machines and the contour lines. This claim is not limited to casino floors, right? It is not. It's any data visual system where you use contour lines to illustrate peak values of anything. And that's the claim, right? Well, the claim says what it says. It's a little more narrow than that. But yes, I mean, the concept in the last element, Your Honor, is a contour generator that generates a display of the retrieved data value. And then it has centered on a data point. And then it has lines that go out from that that are less than value of the data value at the data point. Okay, you're into your rebuttal time. Do you want to stop now? Let me just finish with this one thought, Your Honor, because I think it's the most important thing that we have to say on this appeal. The bottom line is that we get a jury trial based upon the testimony of Mr. Baer alone. He said very clearly that this second pass only occurs, and these inverted cones are created in some instances, and in fact that they're anomalies. That gets us to a jury. Why? Because that clearly shows, as a matter of law, that there's infringing capability. Okay, I think we've heard that point. Thank you. Mr. Busby, is it? Mr. Busby, thank you. All right, you have 15 minutes. Thanks, sir. May I please, the Court, Your Honors? I'll sort of address the issues Mr. Rounds has raised on claim construction. I'll note at JA-23 in the claim construction order, Ballot proposed a plain meaning construction for this disputed claim term. There was none of these arguments, and in fact, the discussion there says that it's possible to have local minimas and local maximas, according to Judge Pro. So these are all new issues on claim construction, and in fact, in their reply brief, they said that we're not arguing a new claim construction.  So I'm not sure why we're discussing claim construction. That shift has passed. Well, I'm still curious. Okay. Are you familiar with our Broadcom versus Emulex opinion from last month? Maybe not. But you're certainly familiar with Finjen. Yes, sir. Okay, so how is this claim construction by Judge Pro consistent with Finjen? So all of those cases, the Typhoon, Finjen, all have the same statement. That it depends on the claims of the case, and in Finjen, Your Honor, that case, the court said, these cases don't require, they actually pointed to the lack of configure-to language in those claims, in that point. In this case, the claims all say, every one of them, configure-to, and that's the language that Judge Pro hung his hat on, and also includes the language each. Configure-to display each contour line at a local maximum. But I mean, I take it that their position is that when it says configure-to produce a result, a system that does that comes within the claim, even if it also does other things at the same time. The way a automobile engine configured to produce propulsion also is configured to idle in a parking space, too. And therefore, the fact that this system, the accused system, again, this is just on the claim construction, that all they had to show was that your system will produce, sometimes, displays that lack inverted cones, putting aside some of their other arguments. And that the district court, in using this language about having to meet the claim limitations all of the time, seemed to be, at least at that point, requiring more than that. And so... Okay. So on the method claims... No, no, I don't think they're claims. We're just talking about the system claims. Method claims is perfectly clear, and you cite an earlier page where the judge said that. Let's just talk about the system. On the system claims, again, as the court noted earlier, Judge Proe addressed both issues, whether it's a limited, configured to, must perform the recited function, as well as the capable of performing the function. And in my view, the claim construction was clear, or his application of the plain meaning of the claim does valet request was, when you have configured to language and then a recited function, you have to perform that function. But not all of the time. You can do, you know, on Mondays through Wednesdays, you can produce displays that have inverted cones, and on Thursdays and Fridays, produce displays that don't have inverted cones. But then you won't meet the claim language. That's the claim construction question. What case says that configured to produce a result means that that result is the only thing produced or that that result is produced all of the time by that configured system as opposed to some of the time or most of the time or whatever? I believe the Finjen case does address that. That's the reason. The reasoning in the Finjen case was that it doesn't have to be all the time because they said, they specifically noted there wasn't a configured to requirement. Right. So Finjen is a case in which the claim language does not use configured language. Correct. So it can't possibly be an interpretation of claim language that does use that. Correct. So what else? The Versada case that they cited from August had two patents in it. I believe the 350 patent and the 400 patent. In the 400 patent, there was actually configured to language in that patent, and the judge, the district court ruled that that requires an actual consistent performance or a performance every time, if I'm using your words correctly, Your Honor, whereas the 350 patent had capable, one claim, one independent claim had capable of language, and the other one, I believe, had memory instruction claim language. And that one, the district court judge did not grant JMO of non-infringement because he said these languages, the language of these claims will allow, sometimes, or no, I'm sorry, reasonably capable of performing the operations with languages. And you're talking about Versada now? Yes, sir. So on the first of the patents you talked, you talked about that you said had configured to language. Is that configured to produce a particular result? A function, yes, sir. That's what the claim said. To perform a function, and I don't have it in front of me, but without anything further in prosecution history or a specification or something else, the court, this court you're saying, said that means that that function has to be performed every time this configured thing runs. That was the ruling of the district court, but in fairness, I believe the district court, and I do believe that they ruled, I believe they reviewed the specification of the patent, I believe, I think in both patents, so they did a proper claim construction analysis. And again, I think the Ball-Aerosol case is another case that supports us. In that case, they said the language... But that's also a case in which, in fact, configured to language doesn't appear in the claims. That's right, but it was construed to mean the function must be performed every time. Not a function. That was about configured to have something under the canvas or something, right, which is a quite different thing. Okay. So, on the actual arguments, Mr. Rounds mentioned the most important issue in this case is that based on the testimony of Mr. Baer alone, it's our position that it's paragraph 58 of Nick Baer's expert report, and that was never discussed in the context of the anomaly argument. Again, this argument, and as we briefed, in our view, has been waived. That issue was never raised. So, here are the arguments made to Judge Crow. Basically, what I call the inverted cone argument or the allegation, according to lawyers, or a theory, as Judge Crow said, that BIS II flips the cone or inverts the cone, in their words, in some instances. And the other argument was the sub-images argument that you heard Mr. Rounds address. Judge Crow went through Nick Baer's report in detail. He cited numerous paragraphs, and if the court takes the time to look at it, you'll see from JA 5442 through JA 5464, all those paragraphs. It's actually a pretty quick read, and you'll see how these cones are created, whether they're a local maxim or a local minima. And it clearly says that these passes occur each time. Now, you're getting to a point to where I'd like for us to go, and that's the way this whole thing works. That you cannot have a local minima unless you have a local maxima. Now, I want you to consider this. Imagine a casino, though it's probably never the case, but imagine a casino that's empty. There's nobody in there. There's no one playing any machines. Are you going to have an inverted cone in that situation under any circumstance? I don't know if you have any cones. You won't have any data. I mean, it's theoretical, but I... Then let's say you begin to populate the casino, and you populate, as we see in some of the images, you bring one gambler to each cluster of machines. Would there be any inverted cones in that instance? Yes, depends on... Now we're doing the relative data values. Let me make sure I understand. Are you saying there's only one at each one? It's the same value at each slot. I don't believe in that hypothetical there would be, but again, there's no evidence of that. Isn't that an instance where you'd have a non-infringing situation? I don't think you'd have either, any types of cones, because everything would be constant. Well, what about one person in the casino working on one slot machine? You're going to have a cone there, right? Correct. Some type of cone. There's going to be some kind of cone, or maybe... And so there aren't going to be any inverted cones shown on that display, right? During the second pass of the software, my understanding is you may next to... I don't think there is. Again, I've seen no evidence of that, but I don't think there is. Why isn't the obviousness of those situations enough to support an inference that sometimes there are going to be displays, even at the whole casino, in which there are no inverted cones, and then putting aside all other arguments, that's enough for proof of infringement? Respectfully, on October 3rd, this court in the Microsoft VIPC case said, in this particular situation, the issue is not for the court to imagine what could have been proven by the defendant in this case, I'm sorry, the plaintiff in this case. The question is, did the fact finder applying the appropriate standard make the proper determination of what could or couldn't or what was or was not proven by the party with the burden of evidence? So there's just no evidence of that. I think this question goes to the question of whether this system must have infringing all the time. I mean, and these are situations that maybe contradict that. Again, one can imagine all types of hypotheticals. For example, the subcrop argument, the claim calls for data visualization, and they're saying, well, what we could do is crop out a small portion of the data, which, although they didn't do it, and Judge Probe specifically pointed out. Right, but they have two arguments of which that is one that feel actually essentially like claim construction arguments that also feel like incorrect claim construction arguments. You can't focus just on subimages in a claim in which you say everything here has to meet a certain condition because you can always crop to find the one that does, and that just can't be what the claim is about, and similarly about the actual data value of the point of the cone because the whole point here is to visualize what's higher and what's lower. This is not that. Okay. This is, they put in some evidence about how your software works. It's supposed to take pictures, basically make images of maps of a casino. Everybody knows. You can take judicial notice that the casino is going to have different numbers of people at different times. I don't know at what time there'd be nobody on the floor. There may be no time, but this doesn't seem to require proof maybe that if you have one player who just can't get up from the machine even when everybody else in the casino has left, you're going to have a display that has no inverted cones, just one point up cone, and that under one construction of the claim, namely the one that says all it has to do is produce one of these things, would be enough. That's, I guess, the question that I think we're focusing on. It wasn't quite a question. One of your assumptions was that they produced evidence of how the software works. See, that's the problem here. There is no evidence from them on how the software works. Judge Proh specifically stated that on the fifth step to creating a local minimus, Mr. Ferraro, he told me, I deposed him, he said, that's not relevant to my analysis. That's footnote 13 in his expert report. He didn't address that. If you look at the claim charts that he cited to and the testimony that Judge Proh cited to, he never addresses the local minimum issue. There is no analysis, source code discussion, images, anything, other than attorney arguments saying what Nick Baer did, what Nick Baer is discussing, discusses an inverted cone argument. There's no discussion of local minima by their expert whatsoever. That's the most distinguishing factor of all the cases cited. Your software, it can do a query on just one machine on the whole floor? I don't, Mr. Chen, Your Honor, I don't know. I really honestly don't know sitting here. I don't know. But the subimage thing, I'm sure they can do like banks, and I'm guessing, but I don't know. I don't know what they can do. Okay. So going back to what your opposing counsel cited to as preserving the claim construction argument below regarding the idea that there will be times after the second pass where there will still be all right side up cones, he cited to the record in a couple different places. Your contention is he waived it. What about those citations to the record that he made? I'm not aware of any citations to the record where they made this argument. Could you quickly address your cross appeal? Yes. It's our position that Yes, Your Honor. It's our position that it came down to Judge Pro applied too stringent of a standard on whether the conduct, the evidence of Ballet's conduct was a substantial factor in the causation element of torturous interference. So, under Judge Pro rightly noted that the law is unclear in Nevada on what constitutes causation. And so he went to California law and under the Ninth Circuit law it's clear that substantial whether the conduct of the alleged causing part. Why wouldn't the conduct be justified or the letter be justified? I mean, Ballet has, this is a client, they have a relationship, they know the prior relationship of the officers of Biz 2 and they set up a business meeting. They want to have a business meeting to discuss basically what's going on. Why isn't that conduct justified? Because the letter alluded to that there was some sort of nefarious conduct by Mr. Biersma, Mr. Cardinal, and Mr. Gordon and there was an issue related to IP rights which was frankly not true. So it went beyond setting up a meeting. It was clearly, and then they even threatened suing Teradata as we stated in our brief for patent infringement that we would enforce our patent rights. But Teradata doesn't make product. They don't make data visualization products. They make data holding products. But that's not a threat against them. No, it wasn't. If you read the letter it says we will enforce our IP rights and I can't remember the exact language but then including Teradata. So it was a clear threat from Mr. Rowe to Teradata that we are very concerned about this issue. Suppose I thought the following. The law plainly is not that any conduct by the defendant that leads to here termination of the relationship with Teradata is actionable. It is rather only that the improper conduct and read suppose I read then the district which has to be the case and then I read the district court discussion of this admittedly brief really to be focusing on that. And then I read the letter and I said boy if there's anything that's not privileged in here it's hard to see. Some of this just as a matter of common sense and patent law is perfectly legitimate. They have a reasonable concern about their patents being infringed. They don't know what Teradata is going to do with BIS2. Teradata may actually be out there selling the software. So they write and they say by the way we've got these patents from what little we know you may be on the verge of doing something to infringe. Maybe there was some implication I'm not sure of that goes beyond what's privileged. But since so much of the letter seems self-evidently privileged at that point mere one thing happens after the other termination followed letter can't be enough. And that's what I basically understand Judge Proto has said. What's wrong with that? I know that that's an elaboration of what he said but why isn't that the common sense of it? Because he applied it in our view more of a but-for standard as opposed to some of the cases we cited out of the California law on the Ninth Circuit said that when there's a temporal aspect very close proximity in the events that's relevant to whether there's a relevant connection between the conduct and the harm. And those under the Ninth Circuit standard those should be a factor. We're not talking three, four, five, six months here. We're talking within the same month that this all occurred. Okay. So let's hear back from Mr. Reynolds please. Thank you, Your Honor. I'm going to add a minute to your four minutes. Thank you. This really I think is very important that we dispel this notion that what Mr. Bair said in his report wasn't raised at summary judgment. On JA 8575 beginning at line two we state the best BIS 2 can claim is that its software always checks to see if some icons need to be converted to upside down cones. BIS 2 never argues nor can it that its software can only create images or sub-images that have at least some upside down cones. And the citation there is to the portion of their brief that relies upon Bair. There was no mystery. The court relied upon Bair. I'm sorry. That's your opposition to the summary judgment? Yes. The court relied upon the Bair report. BIS 2 relied upon the Bair report. And we relied upon the Bair report as a description of the software and how it worked. And that is how we framed our arguments in this portion of the case. The 400 patent that was issued in that case did have configured to language. And the construction was as made and sold contained computer code or program instructions sufficient to perform the operations recited in the claims. That's precisely what we have here. And they construed the other patent in the case the Federal Circuit did in a very similar fashion. I don't believe there's a way that you can read Fingen, Typhoon, and Brasada to say that this was not a capability claim based upon the language. The court can obviously read Ball Aerosol for itself that that was a capability  But they didn't have language like what we're addressing in this case. And that was a case where the claims required the candle holder be actually seated on the cover. So it was an operability claim and that's why there was a finding of no infringement. It was not a capability claim. We don't need Mr. Fingen to prove infringement. We relied upon the bearer report in our argument and that's sufficient. Obviously, the plaintiff patent owner can rely upon all kinds of evidence to prove infringement, one of which can certainly be the opposing expert's report, which is what we did. Are there any more questions about the patent infringement issue? No, but you have less than a minute left. Fine, I'll just move very quickly. There was absolutely no evidence in the record at all that could show causation in this case. Well, except that one thing happened the day after the next. I'm taking liberties with you. Even if the letter were 100% unprivileged? Yes, I believe so. Absolutely. There's still a causation requirement in the tort itself. It's always there. In the Franklin case, which is in all fours, it's exactly what happened. So in Franklin, an affidavit was submitted by the plaintiff saying, these numbers went way down. The court said, as a matter of law, that's insufficient. All of the cases talk about something more than silence. There has to be something more. Okay, that's good. I thank counsel very much. Thank you,